# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN PRECISION INDUSTRIES, INC., | : <br> : <br> : |
| Plaintiff, | : <br> : **Dkt. No. 1:14-cv-01050-RJA-HKS** <br> : |
| vs. | : <br> : **CERTIFICATION OF** <br> : **ADAM J. BUDESHEIM** |
| FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, and NORTH RIVER INSURANCE COMPANY, | : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

**ADAM J. BUDESHEIM**, of full age, hereby declares as follows:

1.      I am an attorney at law of the State of New York and am admitted to practice in the United States District Court for the Western District of New York.

2.      I am a partner with the law firm of McCarter & English, LLP, attorneys for Plaintiff American Precision Industries, Inc. ("API"). I am fully familiar with the facts set forth herein.

3.      I make this Certification in support of API's Motion for Summary Judgment.

4.      I attach hereto as Exhibit "A" a true and correct copy of the Policy Stipulation between API and North River Insurance Company.

5.      I attach hereto as Exhibit "B" a true and correct copy of excerpts from the September 8, 2016 deposition of Timothy T. Greene.

6.      I attach hereto as Exhibit "C" a true and correct copy of excerpts from API's Form 10-K filing with the Securities and Exchange Commission containing its Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

7.      I attach hereto as Exhibit "D" a true and correct copy of excerpts from API's April 23, 2018 Second Supplemental Responses and Objections to Defendants' Requests for Admissions.

8.      I attach hereto as Exhibit "E" true and correct copies of documents produced in this litigation by Fireman's Fund Insurance Company bearing bates labels FFIC-API-0054033 through FFIC-API-0054036.

9.      I attach hereto as Exhibit "F" a true and correct copy of the Complaint in the action captioned *Murray v. Eastern Refractories Co., Inc.*, No. 12-1171 (Mass. Super. Ct.).

10.     I attach hereto as Exhibit "G" a true and correct copy of the July 7, 2020 Stipulation Regarding Defense Fees and Costs Incurred Prior to October 23, 2017.

11.     I attach hereto as Exhibit "H" a true and correct copy of API's June 4, 2018 Responses and Objections to Defendant Federal Insurance Company's Second Set of Interrogatories.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 10, 2020.


By: _s/ Adam J. Budesheim_
     Adam J. Budesheim
     McCarter & English, LLP
     Worldwide Plaza
     825 Eighth Ave., 31st Fl.
     New York, NY 10019
     Phone: 212.609.6800
     Fax: 212.609.6921
     Attorneys for Plaintiff
     American Precision Industries, Inc.

ME1 33754052v.1

# EXHIBIT "A"

| | |
|---|---|
| AMERICAN PRECISION INDUSTRIES, INC., | : **Dkt. No. 1:14-cv-01050-RJA-HKS** |
| Plaintiff, | : |
| vs. | : **POLICY STIPULATION BETWEEN AMERICAN PRECISION INDUSTRIES, INC. AND NORTH RIVER INSURANCE COMPANY** |
| FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, and NORTH RIVER INSURANCE COMPANY, | : |
| Defendants. | : |

This Policy Stipulation is entered into by and between Plaintiff American Precision Industries, Inc. ("API") and Defendant North River Insurance Company ("North River"). API and North River each may be referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, in this lawsuit, API seeks coverage from North River under primary commercial general liability policy number ML-208455 covering the period from December 31, 1974 through December 31, 1977 with $300,000.00 per occurrence limits of liability and $300,000.00 aggregate limits of liability (the "Policy");

WHEREAS, the Policy is missing from the files of both Parties and neither API nor North River has been able to locate a copy of the Policy or any portions thereof;

WHEREAS, the Parties have produced secondary evidence of the Policy during discovery in this litigation;

WHEREAS, North River previously acknowledged the existence of the Policy, but not its terms, conditions, or exclusions; and

ME1 28910941v.1

WHEREAS, North River produced in this litigation policy forms it represents as applicable to the Policy.

Now, therefore, in consideration of the foregoing, the Parties hereby stipulate as follows based upon the available evidence produced during the course of discovery in this matter and the testimony of relevant witnesses:

1. North River issued the Policy to API.

2. "Form MLB-202 (Ed. 1-73)," which is attached hereto as Exhibit "A," and "Appendix A: GL Policy Jacket Provisions," which is attached hereto as Exhibit "B," both form part, and set forth terms and conditions, of the Policy.

3. The Parties are unaware of any exclusion that may have been included in the Policy other than what contained in Exhibits "A" and "B".

4. The Policy provides coverage for claims that fall within the definition of "products hazard" and are not otherwise excluded or limited by other terms and conditions of the Policy.

5. The Policy defines "products hazard" as including "bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others."

6. The undersigned counsel acknowledge and represent that each has the right, power, legal capacity and authority to execute this Policy Stipulation on behalf of its respective client.

7.     In the unexpected event that either Party locates or identifies any document or information prior to trial in this litigation that calls into question the correctness or completeness of the Policy, either Party shall have the right to rescind this Policy Stipulation and the Parties shall endeavor to agree to a new stipulation. If either Party rescinds this Policy Stipulation, the other Party shall have the right to depose the rescinding Party regarding topics related to the rescinded Policy Stipulation and the new-discovered document(s) or information.

**American Precision Industries, Inc.**

By: _____

Gita F. Rothschild
Adam J. Budesheim
David C. Kane
McCarter & English, LLP
100 Mulberry Street
Four Gateway Center
Newark, NJ 07102

DATED: January _16_, 2019

**North River Insurance Company**

By: _____

Martha E. Conlin
Kennedys CMK LLP
100 N. Riverside Plaza
Suite 2100
Chicago, IL 60606
Douglas J. Steinke
Michael J. Tricarico
Kennedys CMK LLP
570 Lexington Avenue
8th Floor
New York, NY 10022

DATED: January _15_, 2019

# EXHIBIT A


In consideration of the payment of the premium, in reliance upon the statements in the Declarations of the policy of which this endorsement is made a part, and subject to all the terms of this endorsement, the Company agrees with the named insured as follows:

## I. COVERAGE—BODILY INJURY AND PROPERTY DAMAGE LIABILITY

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

### Exclusions

This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

(b) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of

  (1) any automobile or aircraft owned or operated by or rented or loaned to any insured, or

  (2) any other automobile or aircraft operated by any person in the course of his employment by any insured;

  but this exclusion does not apply to the parking of an automobile on premises owned by, rented to or controlled by the named insured or the ways immediately adjoining, if such automobile is not owned by or rented or loaned to any insured;

(c) to bodily injury or property damage arising out of (1) the ownership, maintenance, operation, use, loading or unloading of any mobile equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (2) the operation or use of any snowmobile or trailer designed for use therewith;

(d) to bodily injury or property damage arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to any insured;

(e) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of

  (1) any watercraft owned or operated by or rented or loaned to any insured, or

  (2) any other watercraft operated by any person in the course of his employment by any insured;

  but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured;

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

(g) to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(h) to bodily injury or property damage for which the insured or his indemnitee may be held liable

  (1) as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or

(2) if not so engaged, as an owner or lessor of premises used for such purposes,

if such liability is imposed

  (a) by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or

  (b) by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person;

  but part (b) of this exclusion does not apply with respect to liability of the insured or his indemnitee as an owner or lessor described in (2) above;

(i) to property damage to

  (1) property owned or occupied by or rented to the insured,

  (2) property used by the insured, or

  (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;

  but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of elevators at premises owned by, rented to or controlled by the named insured;

(j) to bodily injury or any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the insured under an incidental contract;

(k) to property damage to premises alienated by the named insured arising out of such premises or any part thereof;

(l) to property damage to the named insured's products arising out of such products or any part of such products;

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

  (1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

  (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

  but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(n) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(o) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work forms a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(p) to bodily injury or property damage for which insurance is afforded under

  (1) the SMP Liability Insurance Coverage, or

  (2) any Comprehensive Personal Liability Endorsement forming a part of this policy

  or for which insurance would have been afforded but for the exhaustion of the limits of liability thereunder.

*This Endorsement must be attached to Change Endorsement MLB-20 when issued after the Policy is written.*

## II. LIMIT OF LIABILITY—COVERAGE C

The limit of the Company's liability with respect to each occurrence under this endorsement is the amount stated in the Declarations as applicable to Coverage C of Section II of this policy and such limits apply to the insurance afforded by this endorsement in accordance with the terms of Provision IV, Limits of Liability, of Section II.

## III. OTHER PROVISIONS APPLICABLE TO THIS ENDORSEMENT

A. The following provisions applicable to Sections I and II of the policy are applicable to this endorsement; War Risk and Governmental Action Exclusion; Inspection and Audit, Cancellation; Subrogation; and subparagraph (2) of Policy Period, Territory.

B. The following terms and provisions applicable only to Section II are applicable to this endorsement; Persons Insured; Supplementary Payments; Modification of Terms; Financial Responsibility Laws; Premium; Insured's Duties in the Event of Occurrence, Claim or Suit; Other Insurance; Action Against the Company; Nuclear Exclusion; and Definitions — Section II.

EXHIBIT B

JACKET PAGE 1

## GENERAL INSURING AGREEMENT

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, the company agrees with the named insured as follows:

1. This policy is composed of this Jacket, the declarations page with the applicable Coverage Parts, and any supplementary declarations or schedule pages and endorsements made a part hereof;

2. The provisions of one Coverage Part do not apply to the insurance afforded under any other Coverage Part.

## SUPPLEMENTARY PAYMENTS

The company will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;

(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250 per bail bond, but the company shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the insured for first aid to others, at the time of an accident, for bodily injury to which this policy applies;

(d) reasonable expenses incurred by the insured at the company's request in assisting the company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

## DEFINITIONS

**When used in this policy;**

"**automobile**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment;

"**bodily injury**" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

"**completed operations hazard**" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,

(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury or property damage arising out of

(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in the policy or in the company's manual specifies "including completed operations";

"**elevator**" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an automobile servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

"**incidental contract**" means any written

(1) lease of premises,

(2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad,

(3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality,

(4) sidetrack agreement, or

(5) elevator maintenance agreement;

"**insured**" means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

"**mobile equipment**" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled,

(1) not subject to motor vehicle registration, or

(2) maintained for use exclusively on premises owned by or rented to the named insured, including the ways immediately adjoining, or

(3) designed for use principally off public roads, or

(4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment, and geophysical exploration and well servicing equipment;

"**named insured**" means the person or organization named in Item 1 of the declarations of this policy;

"**named insured's products**" means goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, including any container thereof (other than a vehicle), but "named insured's products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

"**policy territory**" means:

(1) the United States of America, its territories or possessions, or Canada, or

(2) international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, state or nation, or

(3) anywhere in the world with respect to damages because of bodily injury or property damage arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

"**products hazard**" includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;

"**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period;

## CONDITIONS

1. **Premium.** All premiums for this policy shall be computed in accordance with the company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the close of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period the earned premium shall be computed for such period and, upon notice thereof to the named insured, shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the company shall return to the named insured the unearned portion paid by the named insured.

The named insured shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the company at the end of the policy period and at such times during the policy period as the company may direct.

2. **Inspection and Audit.** The company shall be permitted but not obligated to inspect the named insured's property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the named insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

The company may examine and audit the named insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

(Conditions are continued on Jacket Page 2)

## CONDITIONS (Continued)

**3. Financial Responsibility Laws.** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The insured agrees to reimburse the company for any payment made by the company which it could not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**4. Insured's Duties in the Event of Occurrence, Claim or Suit.** (a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

**5. Action Against Company.** No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the insured to determine the insured's liability, nor shall the company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

**6. Other Insurance.** The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) **Contribution by Equal Shares.** If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss

not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) **Contribution by Limits.** If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**7. Subrogation.** In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

**8. Changes.** Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by a duly authorized officer or representative of the company.

**9. Assignment.** Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the named insured shall die, such insurance as is afforded by this policy shall apply (1) to the named insured's legal representative, as the named insured, but only while acting within the scope of his duties as such, and (2) with respect to the property of the named insured, to the person having proper temporary custody thereof, as insured, but only until the appointment and qualification of the legal representative.

**10. Three Year Policy.** If this policy is issued for a period of three years any limit of the company's liability stated in this policy as "aggregate" shall apply separately to each consecutive annual period thereof.

**11. Cancelation.** This policy may be canceled by the named insured by surrender thereof to the company or any of its authorized agents or by mailing to the company written notice stating when thereafter the cancelation shall be effective. This policy may be canceled by the company by mailing to the named insured at the address shown in this policy written notice stating when not less than ten days thereafter such cancelation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender or the effective date and hour of cancelation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing.

If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro-rata. Premium adjustment may be made either at the time cancelation is effected or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation.

**12. Declarations.** By acceptance of this policy, the named insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

---

As respects the company previously designated, the following correlative provision forms a part of this policy:

This is a perpetual mutual corporation owned by and operated for the benefit of its members. This is a non-assessable, participating policy under which the Board of Directors in its discretion may determine and pay unabsorbed premium deposit refunds (dividends) to the insured.

IN WITNESS WHEREOF, the company designated on the Declarations Page has caused this policy to be signed by its President and Secretary, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized representative of the company.

EXHIBIT "B"

1      UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF NEW YORK

3      DOCKET NO. 1:14-cv-01050-RJA-HKS

4

5      AMERICAN PRECISION INDUSTRIES,
       INC.,
6      Plaintiff,
                                   CIVIL ACTION
7
                  vs.              Deposition of:
8                                  TIMOTHY T. GREENE
                                   September 8, 2016
9      FEDERAL INSURANCE COMPANY,
       FIREMAN'S FUND INSURANCE
10     COMPANY, and NORTH RIVER
       INSURANCE COMPANY
11     Defendants.
       - - - - - - - - - - - - - - -
12

13         T R A N S C R I P T of the stenographic

14     notes of the proceedings in the above-entitled

15     matter as taken by and before YNDIRA MEDINA, a

16     Certified Court Reporter and Notary Public for

17     the State of New Jersey, held at the offices of

18     McCarter & ENGLISH, L.L.P., Four Gateway Center,

19     100 Mulberry Street, Suite 1200, Newark, New

20     Jersey 07102 on Thursday, September 8, 2016,

21     commencing at approximately 9:22 in the morning,

22     pursuant to notice.

23

24

25

```
 1    A P P E A R A N C E S:

 2    McCARTER & ENGLISH, L.L.P.

 3    Attorneys for Plaintiff

 4        Four Gateway Center

 5        100 Mulberry Street, Suite 1200

 6        Newark, New Jersey  07102

 7    BY:  BRIAN J. OSIAS, ESQ.

 8    Tel:  (973) 622-4444

 9

10    CROWELL & MORING, L.L.P.

11    Attorneys for Defendant/

12    Fireman's Fund Insurance Company

13        590 Madison Avenue

14        New York, New York  10022

15    BY:  BRIAN J. O'SULLIVAN, ESQ.

16    Tel:  (212) 223-4000

17

18    CARROLL McNULTY & KULL, L.L.C.

19    Attorneys for Defendant/

20    North River Insurance Company

21        100 N. Riverside Plaza, Suite 2100

22        Chicago, Illinois  60606

23    BY:  MARTHA E. CONLIN, ESQ.

24    Tel:  (312) 800-5024

25    (Continued on next page)
```

```
 1    SIEGAL & PARK

 2    Attorneys for Defendant/

 3    Federal Insurance Company

 4       533 Fellowship Road, Suite 120

 5       Mt. Laurel, New Jersey  08054

 6    BY:   EMMETT E. McGOWAN, ESQ.

 7    Tel:  (856) 380-8928

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    "They", being API Heat Transfer.

2    A.    Right.  If they're the one that's named --

3    if American Precision Industries is named, the

4    process server should come directly to Danaher or

5    Fortive.

6        If API Heat Transfer is named, then the

7    process goes to API Heat Transfer, Inc.  And then

8    it goes -- as we said a minute ago -- to their

9    outside counsel, and then they send it to

10   Fortive.

11       Q.    And who is that counsel?

12   A.    I knew you were going to ask me that.  It

13   has changed several times.  Her name is Katriana

14   Rowe (ph), but I cannot tell you the name of her

15   firm without checking a tendered document.

16       Q.    And what happens if Basco's named?

17   A.    So Basco would just be a brand name of API.

18   So if it was named by itself, without any further

19   specificity, like saying, Basco, in addition of;

20   there is no Basco Corporation, at least not in

21   this world.  It wouldn't go anywhere.  It

22   wouldn't be able to be served.

23       Q.    Okay.

24   A.    So the plaintiff would have to correct that.

25       Q.    Does Basco have any of its own

```
 1    approach to growing their presence in that

 2    sector.

 3         Q.    And did you determine during your

 4    research that from 1962 through -- actually,

 5    between 1962 and 1966, how did Basco operate?

 6    A.    I did not determine anything specific.  It

 7    stands for even that it would have been a --

 8    operating as a wholly-owned subsidiary of API.

 9         Q.    Okay.  And that's just an assumption?

10    A.    That's an assumption because there was no

11    corporate transactional documents until 1966,

12    when it was merged.

13         Q.    Okay.  And what is that sentence based

14    on, 1966 Basco was merged?

15    A.    Filing with the State of New York.

16         Q.    So you were able to locate a document

17    evidencing the 1966 merger between Basco and API?

18    A.    A filed certificate of merger with the New

19    York Secretary of State.

20         Q.    Do you have a copy of that?

21    A.    I'm sure I have retained a copy of it.

22         Q.    So the next sentence, [reading] In late

23    1996, API formed three operating subsidiaries.

24    API Heat Transfer, API Basco, Inc., and API Air

25    Tech, Inc. [Reading concluded].
```

1          Do you see that?

2     A.    Yes.

3          Q.    So prior to 1996, those entities were

4     not separately incorporated?  Let's begin there.

5     A.    Correct.

6          Q.    And they operated as divisions of API,

7     Inc.?

8     A.    Yes.

9          Q.    And then on January -- the next

10    sentence reads, [reading] On January 4, 1997, API

11    reorganized by transferring certain, but no

12    liabilities, to each of the operating

13    subsidiaries in exchange for all of the issued

14    and outstanding stock in the operating

15    subsidiaries [reading concluded].

16    A.    Yes.

17         Q.    How did you determine that?

18    A.    So there are transactional documents for

19    each of them, evidencing that transaction.

20         Q.    Okay.

21    A.    That are signed by the respective CEOs of

22    the two corporate entities.  So each payer.  So

23    there's one document for each of the

24    subsidiaries.

25         Q.    Right.  I thought you just said two

# EXHIBIT "C"

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 L8SQ6qftBG3aWEn94pan/g/BrzpXtrK37E5ZQt/ztxnw4RWMWiQTUOHwMg6MVHv+
 YivUVsbnV9WdUHlC2rVSYQ==

<SEC-DOCUMENT>0000950152-96-001228.txt : 19960329
<SEC-HEADER>0000950152-96-001228.hdr.sgml : 19960329
ACCESSION NUMBER:               0000950152-96-001228
CONFORMED SUBMISSION TYPE:      10-K405
PUBLIC DOCUMENT COUNT:          3
CONFORMED PERIOD OF REPORT:     19951229
FILED AS OF DATE:               19960328
SROS:                NYSE

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           AMERICAN PRECISION INDUSTRIES INC
                CENTRAL INDEX KEY:                0000005657
                STANDARD INDUSTRIAL CLASSIFICATION:  ELECTRONIC COILS, TRANSFORMERS & OTHER INDUCTORS [3677]
                IRS NUMBER:                       161284388
                STATE OF INCORPORATION:           DE
                FISCAL YEAR END:                  1229

        FILING VALUES:
                FORM TYPE:        10-K405
                SEC ACT:          1934 Act
                SEC FILE NUMBER:  001-05601
                FILM NUMBER:      96540425

        BUSINESS ADDRESS:
                STREET 1:         2777 WALDEN AVE
                CITY:             BUFFALO
                STATE:            NY
                ZIP:              14225
                BUSINESS PHONE:   7166849700

        MAIL ADDRESS:
                STREET 1:         2777 WALDEN AVENUE
                CITY:             BUFFALO
                STATE:            NY
                ZIP:              14225
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<DESCRIPTION>AMERICAN PRECISION INDUSTRIES 10-K405
<TEXT>

<PAGE>   1

                    SECURITIES AND EXCHANGE COMMISSION
                        WASHINGTON, D.C.  20549
                             FORM 10-K
(MARK ONE)
[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE
      ACT OF 1934
      FOR THE FISCAL YEAR ENDED DECEMBER 29, 1995

                             OR

[  ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES
      EXCHANGE ACT OF 1934
      FOR THE TRANSITION PERIOD FROM _____  TO _____
      COMMISSION FILE NUMBER 1-5601

                    AMERICAN PRECISION INDUSTRIES INC.
            (Exact name of registrant as specified in its charter)
<TABLE>
<S>                                         <C>
        DELAWARE                                        16-1284388
    (State of incorporation)                    (I.R.S. Employer Identification No.)

2777 WALDEN AVENUE, BUFFALO, NEW YORK                               14225
(Address of principal executive offices)                        (Zip Code)
</TABLE>
                        (716)  684-9700
            (Registrant's telephone number, including area code)
```

        ITEM 13.        CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS          37

PART IV.
- --------
        ITEM 14.        EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND
                        REPORTS ON FORM 8-K                                    38
SIGNATURES                                                                     41-42
</TABLE>

                                                                         2

<PAGE>   3
                                PART I
                                ------
ITEM 1.        BUSINESS
               --------

        a.     PRODUCTS AND MARKETING

               The registrant and its subsidiaries (the "Company" or "API")
               conduct operations in three major industrial classifications,
               namely, Heat Transfer, Motion Technologies, and Electronic
               Components.

               The Company continues to direct its efforts towards major sales
               drives for current products in its served markets and target
               markets.  In addition, the Company continues to aggressively
               seek  profitable growth by enhancing and complementing its
               existing technology base.

               HEAT TRANSFER
               -------------

               The Heat Transfer Group, comprised of the Basco and Air
               Technologies Divisions, designs, engineers, and manufactures a
               broad range of heat transfer products which are used in a
               variety of applications, including the cooling of oil, air, and
               other gases; steam condensing; vapor recovery; and many other
               processing requirements. The Group's products are sold for use
               on various types of industrial machinery and for use in power,
               chemical, petrochemical, and refining operations.

               The Basco Division manufacturers a full line of standard and
               custom shell and tube heat exchangers, plate fin intercoolers
               and aftercoolers, and Centraflow steam surface condensers.  The
               Air Technologies Division produces a full line of aluminum
               air-to-air and air-to-liquid heat exchangers for use on air
               compressors, construction equipment, and industrial machines.

               The Group generates its bookings and sales through a network of
               sales representatives whose territories are geographically
               defined.  The majority of sales are made to original equipment
               manufacturers, with the balance of sales made to end users,
               usually for use in a plant or processing application.

               During 1995, the Group upgraded its computer hardware and
               software systems to support the upcoming growth objectives. In
               addition to the capability to support additional sales volume,
               significant benefits are expected in inventory management,
               scheduling, and cost control.

               Throughout the year the Basco Division reorganized departmental
               responsibilities into a format that fits its  future business
               operating strategy and upgraded management positions in
               Engineering, Manufacturing, and Marketing. This action, combined
               with upgrades in machinery and equipment, has positioned this
               Division to become an even larger force in the heat exchanger
               industry.  In addition, Basco has secured overseas
               representation, and as a result obtained significant business in
               Germany.

               The Air Technologies Division experienced over 30% growth during
               1995, and this, combined with healthy projections for 1996, has
               created the need for a larger facility. We expect to complete a
               new 80,000 square foot manufacturing facility in 1996. This

move will approximately double the floor space currently in use
and will allow for both more efficient production of current
backlog, as well as the required space for expected future
growth. This new facility, coupled with planned heavy
investments in capital equipment  will enable this Division to
pursue a leadership role in its industry. High quality,
flexibility, and strength of design, along with serviceability
to our customers at a competitive price, continues to drive the
Air Technologies Division to new heights.

The Group will continue to pursue new products and new markets
and strive for further productivity gains and processing
improvement to enhance value to its customers.

MOTION TECHNOLOGIES
-------------------

The Motion Technologies Group is comprised of the Controls,
Deltran, Harowe, and Rapidsyn  Divisions.  In addition, on
January 1, 1995, the Group assumed the management of the
day-to-day operations of Gettys Corporation, a manufacturer of
precision industrial motors located in Racine, Wisconsin.

During 1995, the number of facilities occupied by the Group was
reduced from six to four. The Rapidsyn Division was relocated
from Oceanside, California and merged into the Gettys facilities
in Wisconsin. The Controls and Deltran facilities were also
relocated into one larger, state-of-the-art facility in Amherst,
New York.

CONTROLS The Controls Division offers a complete line of drives,
controls, power-supplies, and applications support for motion
control systems, including factory automation, semi-conductor
equipment, printing, packaging, and winding equipment,
positioning tables, fluid metering, and electronics assembly
applications. During 1995, the Division continued to focus its
efforts on developing the Intelligent Drive family of products.
This product line provides the user with an integrated microstep
controller and drive unit with built-in network communications.
In 1996, plans are to continue development of the Intelligent
Drive family, including a new brushless servo unit that will be
directed to specific market opportunities in semi-conductor and
medical applications.

DELTRAN  The Deltran Division manufactures high quality
electro-magnetic clutches and brakes used in sophisticated
rotary control applications. During 1995, the Division developed
a new line of spring-set brakes for servo motors. This highly
tooled product line will allow Deltran to become a leader within
this market, just as they are today in the office copier market.
The Division recently formed an alliance with Xerox Corporation,
being only the second company in the United States to do so,
which assures Deltran a long-term, profitable relationship as
the major supplier of clutches to Xerox world-wide. Significant
cost reductions are planned for 1996, such as the start-up of a
new manufacturing plant in St. Kitts, West Indies, and further
off-shore sourcing of key components. These efforts will
further enhance the Division's position within the highly
competitive markets in which it focuses.

HAROWE SERVO CONTROLS, INC. Harowe produces precision motors and
feedback devices for medical, factory automation, and aerospace
markets. The motors are fractional horsepower AC, DC brushless,
and stepper types. The feedback devices

consist of tachometers, synchros, and resolvers which provide
velocity or position feedback. Harowe plans to  develop and
introduce new feedback components in 1996. These will include
resolver-to-digital electronic packages and optical encoders.
Harowe will continue implementing cellular manufacturing that
was initiated in 1995. These efforts have already resulted in
shorter lead time and improved quality, productivity, and
on-time delivery.

RAPIDSYN  The Rapidsyn Division offers a full line of step

```
                  --------------------------------
```

The Company charges earnings directly for research and product
development expenses.  Costs for Company-sponsored programs,
excluding capital expenditures, were approximately $1,111,000,
$888,000, and $602,000,  in 1995, 1994, and 1993,  respectively.

h.    ENVIRONMENTAL MATTERS
      ---------------------

In 1990, the U.S. Environmental Protection Agency (EPA) named
the Company a potentially responsible party (PRP) with respect
to hazardous substances disposed of at the Envirotek II Site
(the Site) in Tonawanda, New York. The Company is a member of a
steering committee which was formed to facilitate discussions
with the EPA.  The Company was named a de minimis participant
with respect to the first phase of the clean-up action and was
relieved of any potential liability for the first phase clean-up
with the payment of a minor fee.  The EPA has since advised the
Company that its name had been removed from the PRP list. The
State of New York has also indicated to the Envirotek II PRP
Group its intention to pursue additional remedial measures at a
site which surrounds the Site. It is not possible at this time
to determine, whether and to what extent, the Company will incur
additional liability as a result of any future government or
private action.

                                                          7

<PAGE>  8
        i.    EMPLOYEES
              ---------

At December 29, 1995, 1,019 persons were employed by the Company.

        j.    LINES OF BUSINESS AND INDUSTRY SEGMENT INFORMATION
              --------------------------------------------------

The Company's operations in 1995 were carried on through seven
divisions and two subsidiaries.  Operations are classified into
three industry segments based upon the characteristics of
manufacturing processes and the nature of markets served.  The
operating units which currently comprise the segments and their
principal products are as follows:

<TABLE>
<CAPTION>

| Segment | Principal Products |
| ------- | ------------------ |
| <S> | <C> |
| Heat Transfer: | |
| ------------- | |
| | |
| Air Technologies Division | Air-to-air aluminum heat exchangers |
| Basco Division | Shell and tube heat exchangers |
| | |
| Motion Technologies: | |
| ------------------- | |
| | |
| Controls Division | Drives, power supplies, and controllers |
| Deltran Division | Electro-magnetic clutches and brakes |
| Harowe Servo Controls Inc. | Resolvers and DC motors |
| Harowe Servo Controls (St. Kitts) Ltd. | Resolvers and DC motors |
| Rapidsyn Division | Step motors |
| | |
| Electronic Components: | |
| --------------------- | |
| | |
| Delevan Division | Axial-leaded inductors |
| Surface Mounted Devices Division | Surface mounted inductors |

</TABLE>

Amounts of revenue from sales to unaffiliated customers,
operating profit or loss, and identifiable assets for the three
years ended December 29, 1995, are included in Note M of the
notes to consolidated financial statements on page(s) 34-35 of
this document.

        k.    FOREIGN OPERATIONS
              ------------------

# EXHIBIT "D"



**McCARTER & ENGLISH**
ATTORNEYS AT LAW

April 23, 2018

**VIA E-MAIL**

Seth Goodman Park, Esq.
Emmett Eugene McGowan, Esq.
Siegal & Park
533 Fellowship Road
Suite 120
Mount Laurel, NJ 08054
*emmett.mcgowan@mclolaw.com*
*seth.park@mclolaw.com*

Jay David Kenigsberg, Esq.
Lawrence A. Levy, Esq.
Michael Kotula, Esq.
Peter P. McNamara, Esq.
Rivkin, Radler LLP
926 RXR Plaza
Uniondale, NY 11556
*jay.kenigsberg@rivkin.com*
*larry.levy@rivkin.com*
*michael.kotula@rivkin.com*
*peter.mcnamara@rivkin.com*

Douglas J. Steinke, Esq.
Michael J. Tricarico, Esq.
Martha E. Conlin, Esq.
Kennedys CMK LLP
570 Lexington Avenue, 8th Floor
New York, NY 10022
*douglas.steinke@kennedyscmk.com*
*michael.tricarico@kennedyscmk.com*
*martha.conlin@kennedyscmk.com*

Adam J. Budesheim
Partner
T. 973-848-8616
F. 973-297-3740
abudesheim@mccarter.com

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4056
T. 973.622.4444
F. 973.624.7070
www.mccarter.com

Re: *American Precision Industries, Inc. v. Federal Insurance Co., et al.*
No. 1:14-cv-01050 (W.D.N.Y.)

BOSTON

Dear Counsel:

HARTFORD

STAMFORD

NEW YORK

Pursuant to the Court's March 8, 2018 Decision and Order, we write to provide Plaintiff American Precision Industries, Inc.'s ("API") second supplemental responses and objections to Defendants' Requests for Admissions. API incorporates by reference each of its General Objections set forth in its December 23, 2016 supplemental responses and objections.

NEWARK

EAST BRUNSWICK

PHILADELPHIA

WILMINGTON

WASHINGTON, DC

32. Admit that API is named as a defendant in only one of the 753 Underlying Asbestos Suits identified in the bordereaux attached hereto as Exhibit "A", namely, Aminta Defore, et al v. A.O. Smith, et al, Civil Action No. 14-0086, In The Circuit Court of Jasper County, Mississippi, First Judicial District. If your response to this Request is anything other than an unequivocal admission, identify each and every Underlying Asbestos Suit in which API is named as a defendant.

**RESPONSE: In addition to its General Objections, which are incorporated by reference herein, API specifically objects to this Request on the ground that it seeks information with no relevance to this action because the liabilities for the Underlying Asbestos Suits belong to API, rather than the improperly named defendants. Pursuant to the March 8, 2018 Decision and Order, nevertheless, API admits API is a named defendant in only one of the 753 Underlying Asbestos Suits identified in lawsuits identified in Exhibit "A."**

40. Admit that API Heat Transfer Inc. is not a named insured or additional insured under any of the Federal Policies.

**RESPONSE: In addition to its General Objections, which are incorporated by reference herein, API specifically objects to this Request on the grounds that it seeks a legal conclusion, rather than a fact, and has no relevance to this litigation because API Heat Transfer Inc. has no liabilities for the Underlying Asbestos Suits. Pursuant to the March 8, 2018 Decision and Order, nevertheless, API denies this Request. Federal's policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 provides, among other things:**

> **"Subsidiaries or Newly Acquired or Formed Organizations"**
>
> **If there is no other similar insurance available, the following will qualify to be a named insured:**
>
> **• Any financially controlled subsidiary of yours; or**
>
> **• Any organization you newly acquired or formed during the policy period, other than a partnership, joint venture, or limited liability company, and over which you maintain ownership or majority interest. This coverage is effective on the acquisition or formation date and is afforded only until the end of the policy period during which the acquisition or formation took place.**

**API Heat Transfer Inc. formed as a corporation on September 20, 1996 as a wholly owned subsidiary of API. As a result, API Heat Transfer Inc. qualifies as a "named insured" under Federal's policy number 3530-67-00 covering April 1, 1996 through April 1, 1997.**

41. Admit that API AirTech Inc. is not a named insured or additional insured under any of the Federal Policies.

**RESPONSE: In addition to its General Objections, which are incorporated by reference herein, API specifically objects to this Request on the**

grounds that it seeks a legal conclusion, rather than a fact, and has no relevance to this litigation because API AirTech Inc. has no liabilities for the Underlying Asbestos Suits.  Pursuant to the March 8, 2018 Decision and Order, nevertheless, API denies this Request.  Federal's policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 provides, among other things:

"Subsidiaries or Newly Acquired or Formed Organizations"

If there is no other similar insurance available, the following will qualify to be a named insured:

• Any financially controlled subsidiary of yours; or

• Any organization you newly acquired or formed during the policy period, other than a partnership, joint venture, or limited liability company, and over which you maintain ownership or majority interest.  This coverage is effective on the acquisition or formation date and is afforded only until the end of the policy period during which the acquisition or formation took place.

API AirTech Inc. formed as a corporation on September 20, 1996 as a wholly owned subsidiary of API.  As a result, API AirTech Inc. qualifies as a "named insured" under Federal's policy number 3530-67-00 covering April 1, 1996 through April 1, 1997.

42. Admit that API Basco Inc. is not a named insured or additional insured under any of the Federal Policies.

RESPONSE: In addition to its General Objections, which are incorporated by reference herein, API specifically objects to this Request on the grounds that it seeks a legal conclusion, rather than a fact, and has no relevance to this litigation because API Basco Inc. has no liabilities for the Underlying Asbestos Suits.  Pursuant to the March 8, 2018 Decision and Order, nevertheless, API denies this Request.  Federal's policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 provides, among other things:

"Subsidiaries or Newly Acquired or Formed Organizations"

If there is no other similar insurance available, the following will qualify to be a named insured:

• Any financially controlled subsidiary of yours; or

> • **Any organization you newly acquired or formed during the policy period, other than a partnership, joint venture, or limited liability company, and over which you maintain ownership or majority interest. This coverage is effective on the acquisition or formation date and is afforded only until the end of the policy period during which the acquisition or formation took place.**

**API Basco formed as a corporation on September 20, 1996 as a wholly owned subsidiary of API. As a result, API Basco Inc. qualifies as a "named insured" under Federal's policy number 3530-67-00 covering April 1, 1996 through April 1, 1997.**

50. Admit that the entities for whom API expended defense costs in 752 of the 753 Underlying Asbestos Suits identified in the bordereaux attached hereto as Exhibit "A" are not named insureds or additional insureds under any of the Federal Policies.

**RESPONSE: In addition to its General Objections, which are incorporated by reference herein, API specifically objects to this Request on the ground that it seeks information with no relevance to this action because API incurred defense expenses to defend its own liabilities in the Underlying Asbestos Suits, rather than those of the improperly named defendants. Pursuant to the March 8, 2018 Decision and Order, nevertheless, API denies this Request and incorporates by reference its responses to Request Nos. 40-42.**

57. Admit that API Heat Transfer Inc. is not a named insured or additional insured under any of the FFIC Policies.

**RESPONSE: In addition to its General Objections, which are incorporated by reference herein, API specifically objects to this Request on the grounds that it seeks a legal conclusion, rather than a fact, and has no relevance to this litigation because API Heat Transfer Inc. has no liabilities for the Underlying Asbestos Suits. Accordingly, API is not seeking coverage for API Heat Transfer Inc. from FFIC. Pursuant to the March 8, 2018 Decision and Order, nevertheless, API admits this Request on the ground that, as of the termination date of FFIC's last policy, API Heat Transfer Inc. had not yet formed, which supports API's position that the asbestos liabilities belong to API.**

**EXHIBIT "E"**

COMMERCIAL LIABILITY
COVERAGE

*GENERAL LIABILITY COVERAGE*

**Comprehensive General
Liability Insurance**

*POLICY COVERAGE*

**GL 00 02 01 73**

These policy provisions, together with all applicable terms, conditions and exclusions of the policy and the coverage parts and endorsements made a part hereof by designation in the Declarations, complete the Liability Coverage of this policy.

## COVERAGE PART — COMPREHENSIVE GENERAL LIABILITY INSURANCE

### 1. INSURING AGREEMENT

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

### 2. EXCLUSIONS

This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

(b) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of (1) any automobile or aircraft owned or operated by or rented or loaned to any insured, or (2) any other automobile or aircraft operated by any person in the course of his employment by any insured; but this exclusion does not apply to the parking of an automobile on premises owned by, rented to or controlled by the named insured or the ways immediately adjoining, if such automobile is not owned by or rented or loaned to any in-

(c) to bodily injury or property damage arising out of (1) the ownership, maintenance, operation, use, loading or unloading of any mobile equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (2) the operation or use of any snowmobile or trailer designed for use therewith;

(d) to bodily injury or property damage arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to any insured;

(e) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of (1) any watercraft owned or operated by or rented or loaned to any insured, or (2) any other watercraft operated by any person in the course of his employment by any insured; but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured;

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

(g) to bodily injury or property damage due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to (1) liability assumed by insured under an incidental contract, or (2) expenses for first aid under the Supplementary Payments provision;

(h) to bodily injury or property damage for which the insured or his indemnitee may be held liable (1) as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or (2) if not so engaged, as an owner or lessor of premises used for such purposes, if such liability is imposed (i) by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or (ii) by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person; but part (ii) of this exclusion does not apply with respect to liability of the insured or his indemnitee as an owner or lessor described in (2) above;

**This Endorsement must be attached to Change Endorsement when issued after the Policy is written.**

ONE OF THE **FIREMAN'S FUND INSURANCE COMPANIES** AS NAMED IN THE POLICY

IJXCL

/ PRESIDENT

FFIC-API-0054033

(i) to any obligation for which the insured or any carrier as his insurer may be held liable under any workers' compensation, unemployment compensation or disability benefits law, or under any similar law;

(j) to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the insured under an incidental contract;

(k) to property damage to (1) property owned or occupied by or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control; but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured;

(l) to property damage to premises alienated by the named insured arising out of such premises or any part thereof;

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from (1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured; but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(n) to property damage to the named insured's products arising out of such products or any part of such products;

(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use to the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

## 3. PERSONS INSURED

Each of the following is an insured under this insurance to the extent set forth below:

(a) if the named insured is designated in the Declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the named insured with respect to the conduct of such a business;

(b) if the named insured is designated in the Declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the named insured is designated in the Declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(d) any person (other than an employee of the named insured) or organization while acting as real estate manager for the named insured; and

(e) with respect to the operation, for the purpose of locomotion upon a public highway, of mobile equipment registered under any other motor vehicle registration law, (i) an employee of the named insured while operating any such equipment in the course of his employment, and (ii) any other person while operating with the permission of the named insured any such equipment registered in the name of the named insured and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization;

provided that no person or organization shall be an insured under this paragraph (e) with respect to: (1) bodily injury to any fellow employee of such person injured in the course of his employment, or (2) property damage to property owned by, rented to, in charge of or occupied by the named insured or the employer of any person described in subparagraph (ii).

This insurance does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured.

## 4. LIMITS OF LIABILITY

Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, (3) claims made or suits brought on account of bodily injury or property damage or (4) units of mobile equipment to which this policy applies, the Company's liability is limited as follows:

(a) Separate limits of liability for bodily injury liability and property damage liability.

The total liability of the Company for all damages, including damages for care and loss of services, because of bodily injury sustained by one or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the Declarations as applicable to "each occurrence."

Subject to the above provision respecting "each occurrence," the total liability of the Company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the Declarations as "aggregate."

The total liability of the Company for all damages because of all **property damage** sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of **property damage** liability stated in the Declarations as applicable to "each occurrence."

Subject to the above provision respecting "each occurrence," the total liability of the Company for all damages because of all **property damage** to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of **property damage** liability stated in the Declarations as "aggregate": (1) all **property damage** arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis, including **property damage** for which liability is assumed under any **incidental contract** relating to such premises or operations, but excluding **property damage** included in subparagraph (2) below; (2) all **property damage** arising out of and occurring in the course of operations performed for the **named insured** by independent contractors and general supervision thereof by the **named insured**, including any such **property damage** for which liability is assumed under any **incidental contract** relating to such operations, but this subparagraph (2) does not include **property damage** arising out of maintenance or repairs at premises owned by or rented to the **named insured** or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures; (3) all **property damage** included within the **products hazard** and all **property damage** included within the **completed operations hazard**.

Such aggregate limit shall apply separately to the **property damage** described in subparagraphs (1), (2) and (3) above, and under subparagraphs (1) and (2), separately with respect to each project away from premises owned by or rented to the **named insured**.

**(b) Combined single limit of liability for bodily injury and property damage liability.**

The total liability of the Company for all damages under all **bodily injury** liability and **property damage** liability coverages of this policy because of **bodily injury** or **property damage** sustained by one or more persons or organizations as a result of any one **occurrence** shall not exceed the limit of liability stated in the Declarations for "each occurrence."

Subject to the above provision respecting "each occurrence," the total liability of the Company for all damages arising out of the **products hazard** and **completed operations hazard** shall not exceed the limits of liability stated in the Declarations as "aggregate."

Subject to the above provision respecting "each occurrence," the total liability of the Company for all damages because of all **property damage** to which the policy applies

(i) arising out of premises or operations rated on a remuneration basis or contractors equipment rated on a receipts basis, including liability assumed under any inciden-

tal contract relating to such premises or operations or

(ii) arising out of and occurring in the course of operations, other than maintenance or repairs at premises owned by or rented to the **named insured** or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures, performed for the **named insured** by independent contractors and general supervision thereof by the **named insured** including liability assumed under any **incidental contract** relating to such operations

shall not exceed the limit of liability stated in the Declarations as "aggregate." Said aggregate limit of liability shall apply separately to (i) and (ii) and under each separately to each project away from premises owned by or rented to the **named insured**.

With respect to any **occurrence** for which notice of this policy is given in lieu of security or when this policy is certified as proof of financial responsibility for the future under the provisions of the motor vehicle financial responsibility law of any state, province or other territorial jurisdiction, the stated limits of liability as respects each **occurrence** shall be applied to provide the separate limits of liability required by such law for **bodily injury** liability and **property damage** liability to the extent of the coverage required by such law, but the separate application of such limits shall not increase the total limit of the Company's liability.

For the purpose of determining the limit of the Company's liability under (a) or (b) above, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence**.

## 5. POLICY PERIOD; TERRITORY

This insurance applies only to **bodily injury** or **property damage** which occurs during the Policy Period within the **policy territory**.

**6. When used as a premium basis:**

"**admissions**" means the total number of persons, other than employees of the **named insured**, admitted to the event insured or to events conducted on the premises whether on paid admission tickets, complimentary tickets or passes;

"**cost**" means the total cost to the **named insured** with respect to operations performed for the **named insured** during the policy period by independent contractors of all work let or sub-let in connection with each specific project, including the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of such work, whether furnished by the owner, contractor or subcontractor, including all fees, allowances, bonuses or commissions made, paid or due;

"**receipts**" means the gross amount of money charged by the **named insured** for such operations by the **named insured** or by others during the policy period as are rated on a receipts basis other than receipts from telecasting, broadcasting or motion pictures, and includes taxes, other than taxes which the **named insured** collects as a separate

FFIC-API-0054035

item and remits directly to a governmental division;

**"remuneration"** means the entire remuneration earned during the policy period by proprietors and by all employees of the **named insured,** other than chauffeurs (except operators of mobile equipment) and aircraft pilots and co-pilots, subject to any overtime earnings or limitation of remuneration rule applicable in accordance with the manuals in use by the Company;

**"sales"** means the gross amount of money charged by the **named insured** or by others trading under his name for all goods and products sold or distributed during the policy period and charged during the policy period for installation, servicing or repair, and includes taxes, other than taxes which the **named insured** and such others collect as a separate item and remit directly to a governmental division.

FFIC-API-0054036

EXHIBIT "F"



COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX: ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

CATHERINE MURRAY, as Executrix of the Estate of JOHN M. MURRAY,

        Plaintiff,

Civil Action 12–1171
No.: 12-

v.

EASTERN REFRACTORIES COMPANY, INC.;
GENERAL INSULATION COMPANY;
A. W. CHESTERTON COMPANY;
FEDERAL MOGUL ASBESTOS PERSONAL INJURY TRUST
    as Successor to the Former VELLUMOID Division
    of FEDERAL-MOGUL;
JOHN CRANE, INC.;
API HEAT TRANSFER INC.;
CRANE CO., as Successor to COCHRANE CORP.;
HARSCO CORPORATION f/k/a THE PATTERSON-KELLEY CO., INC.;
PROCESS ENGINEERING AND MACHINE CO., INC.;
ROSS HEAT EXCHANGER Division of AMERICAN STANDARD, INC.;
SPX COOLING TECHNOLOGIES, INC. Individually
    and as Successor to THE MARLEY COOLING TOWER COMPANY;
YUBA HEAT TRANSFER LLC;
BAYER CROPSCIENCE, INC. as Successor to AMCHEM, INC.;
RAPID-AMERICAN CORPORATION;
AIR & LIQUID SYSTEMS CORPORATION
    as Successor by Merger to BUFFALO PUMPS, INC.;
ALFA LAVAL, INC. Individually and as Successor to THE DE LAVAL SEPARATOR CO.
    and SHARPLES, INC.;
AURORA PUMP CO.;
BW/IP INTERNATIONAL, INC., as Successor to BYRON JACKSON PUMPS;
CARRIER CORPORATION a/k/a BRYANT HEATING & COOLING SYSTEMS, INC.;
CARRIER CORPORATION as Successor by Merger to ELLIOTT COMPANY;
CORNELL PUMP COMPANY;
CRANE CO.;
DUNHAM-BUSH, INC.;
ELECTRO DYNAMIC CORPORATION;
ELECTROLUX HOME PRODUCTS, INC.
    f/k/a WHITE CONSOLIDATED INDUSTRIES, INC. f/k/a COPES-VULCAN, INC.
    and JERGUSON GAGE AND VALVE COMPANY;
FLOWSERVE CORPORATION f/k/a THE DURIRON CO., INC.,
    DURCO INTERNATIONAL, INC. and BYRON JACKSON COMPANY;
FLOWSERVE US, INC. as Successor to ROCKWELL MANUFACTURING CO.,
    EDWARD VALVES, INC. and NORDSTROM VALVES, INC.;

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

FMC f/k/a NORTHERN PUMP and PEERLESS PUMP CO.;
GARDNER DENVER, INC.;
GOULDS PUMPS INCORPORATED;
IMO INDUSTRIES, INC. f/k/a DELAVAL STEAM TURBINE COMPANY;
INGERSOLL-RAND COMPANY;
ITT CORPORATION as Successor to BELL & GOSSETT, HOFFMAN PUMPS,
    and KENNEDY VALVES;
MAROTTA CONTROLS, INC.;
MARSHALL ENGINEERED PRODUCTS COMPANY, LLC;
MILWAUKEE VALVE COMPANY, INC.;
NELES-JAMESBURY, INC. f/k/a JAMESBURY CORPORATION;
PARKER-HANNIFIN CORPORATION;
QUAKER CHEMICAL CORPORATION;
ROPER INDUSTRIES, INC.;
ROTH PUMP COMPANY;
SEPCO CORPORATION;
STERLING FLUID SYSTEMS (USA), INC., Individually and as
    Successor to PEERLESS PUMP CO.;
TACO, INC.;
THE FAIRBANKS COMPANY;
THE GORMAN-RUPP COMPANY;
TYCO VALVES & CONTROLS, INC. as Successor to CROSBY VALVES;
VELAN VALVE CORPORATION;
VIAD CORP. as Successor to GRISCOM RUSSELL;
VIKING PUMP, INC.;
WARREN PUMPS LLC;
YARWAY CORPORATION;
YEOMANS CHICAGO CORPORATION;
YORK INTERNATIONAL CORPORATION;
SELBY, BATTERSBY & COMPANY;
GRAVER TECHNOLOGIES LLC;
MARMON WIRE & CABLE LLC f/k/a THE MARMON CORPORATION,
    Successor to ECODYNE WATER TREATMENT LLC; and
MARMON WIRE & CABLE LLC f/k/a THE MARMON CORPORATION,
    Successor to GRAVER TECHNOLOGIES;

Defendants.

Now comes the plaintiff, by her attorneys, and files the following complaint:

1.    PARTY PLAINTIFF

The plaintiff, Catherine Murray, is the Executrix of the Estate of John M. Murray, and resides

at 22 Inland Street, Bradford, Massachusetts 01835.

## 2.   PARTY DEFENDANTS

2A.   The defendant, Eastern Refractories Company, Inc., is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business located in the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2B.   The defendant, General Insulation Company, is a corporation duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Medford, Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2C.   The defendant, A. W. Chesterton Company, is a corporation incorporated under the laws of the Commonwealth of Massachusetts having a principal place of business located in the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2D.   The defendant, Federal-Mogul Asbestos Personal Injury Trust as Successor to the former Vellumoid Division of Federal-Mogul, is a foreign corporation incorporated under the laws of the State of Delaware, having a principal place of business outside the Commonwealth of Massachusetts, and has conducted business in the Commonwealth of Massachusetts.

2E.   The defendant, John Crane, Inc., is a Delaware corporation with a principal place of business in the State of Illinois and has conducted business in the Commonwealth of Massachusetts.

2F.   The defendant, API Heat Transfer Inc., is a corporation incorporated under the laws of the State of New York with a principal place of business in the State of New York and has conducted business in the Commonwealth of Massachusetts.

2G.   The defendant, Crane Co., as Successor to Cochrane Corp., is a corporation incorporated under the laws of the State of New York, having a principal place of business in the State of New York and has conducted business in the Commonwealth of Massachusetts.

2H.   The defendant, Harsco Corporation f/k/a The Patterson-Kelley Co., Inc., is a foreign corporation incorporated under the laws of the State of Delaware with a principal place of business

3

outside the Commonwealth of Massachusetts and has done business in the Commonwealth of Massachusetts.

2I. The defendant, Process Engineering and Machine Company, Inc., is a foreign corporation with a principal place of business in the State of New Jersey and has conducted business in the Commonwealth of Massachusetts.

2J. The defendant, Ross Heat Exchanger Division of American Standard, Inc., is a Delaware corporation with a principal place of business in the State of New Jersey which has conducted business in the Commonwealth of Massachusetts.

2K. The defendant SPX Cooling Technologies, Inc. Individually and as Successor to The Marley Cooling Tower Company, is a foreign corporation incorporated under the laws of the State of Delaware, having a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2L. The defendant, Yuba Heat Transfer LLC, is a foreign corporation having a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2M. The defendant, Bayer CropScience, Inc. as Successor to Amchem, Inc., is a New York corporation having a principal place of business in North Carolina which has conducted business in the Commonwealth of Massachusetts.

2N. The defendant, Rapid-American Corporation, is the legal successor to the Philip Carey Manufacturing Company and is a corporation incorporated under the laws of the State of Delaware, having a principal place of business outside the Commonwealth of Massachusetts, and on information and belief has conducted business in the Commonwealth of Massachusetts itself and through its predecessor corporation.

4

20.     The defendant, Air & Liquid Systems Corporation as Successor by Merger to Buffalo Pumps, Inc., is a foreign corporation with a principal place of business in the State of Pennsylvania and has conducted business in the Commonwealth of Massachusetts.

2P.     The defendant, Alfa Laval, Inc. Individually and as Successor to The De Laval Separator Co. and Sharples, Inc., is a foreign corporation having a principal place of business outside the Commonwealth of Massachusetts. and has conducted business in the Commonwealth of Massachusetts.

2Q.     The defendant, Aurora Pump Co., is a foreign corporation with a principal place of business outside the Commonwealth of Massachusetts which has conducted business in the Commonwealth of Massachusetts.

2R.     The defendant, BW/IP International, Inc. as Successor to Byron Jackson Pumps, is a foreign corporation incorporated under the laws of the State of Delaware, having a principal place of business in the State of California, and has conducted business in the Commonwealth of Massachusetts.

2S.     The defendant, Carrier Corporation a/k/a Bryant Heating & Cooling Systems, Inc., is a Delaware corporation having a principal place of business in the State of Connecticut and has conducted business in the Commonwealth of Massachusetts.

2T.     The defendant, Carrier Corporation as Successor by Merger to Elliott Company, is a Delaware corporation having a principal place of business in the State of Connecticut and has conducted business in the Commonwealth of Massachusetts.

2U.     The defendant, Cornell Pump Company, is a corporation incorporated under the laws of the State of Delaware with a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

5

2V.    The defendant, Crane Co., is a corporation incorporated under the laws of the State of New York, having a principal place of business in the State of New York and has conducted business in the Commonwealth of Massachusetts.

2W.    The defendant, Dunham-Bush, Inc., is a foreign corporation with a principal place of business outside the Commonwealth of Massachusetts which has done business in Massachusetts.

2X.    The defendant, Electro Dynamic Corporation, is a foreign corporation, with a principal place of business outside the Commonwealth of Massachusetts, which has conducted business in the Commonwealth of Massachusetts.

2Y.    The defendant, Electrolux Home Products, Inc. f/k/a White Consolidated Industries, Inc. f/k/a Copes-Vulcan, Inc. and Jerguson Gage and Valve Company, is a foreign corporation, incorporated under the laws of the State of Delaware, with a principal place of business outside the Commonwealth of Massachusetts and on information and belief has conducted business in the Commonwealth of Massachusetts.

2Z.    The defendant, Flowserve Corporation f/k/a The Duriron Co., Inc., Durco International, Inc. and Byron Jackson Company, is a corporation incorporated under the laws of the State of New York, having a principal place of business in the State of Texas and has conducted business in the Commonwealth of Massachusetts.

2AA.    The defendant, Flowserve US, Inc. as Successor to Rockwell Manufacturing Co., Edward Valves, Inc. and Nordstrom Valves, Inc., is a foreign corporation incorporated under the laws of the State of Delaware, having a principal place of business in the State of Texas, and has conducted business in the Commonwealth of Massachusetts.

2BB.    The defendant, FMC f/k/a Northern Pump and Peerless Pump Co., is a foreign corporation with a principal place of business outside the Commonwealth of Massachusetts which has done business in the Commonwealth of Massachusetts.

6

2CC. The defendant, Gardner Denver, Inc., is a foreign corporation with a principal place of business outside the Commonwealth of Massachusetts which has done business in Massachusetts.

2DD. The defendant, Goulds Pumps Incorporated, is a foreign corporation, with a principal place of business outside the Commonwealth of Massachusetts, which has conducted business in the Commonwealth of Massachusetts.

2EE. The defendant, IMO Industries, Inc. f/k/a DeLaval Steam Turbine Company, is a foreign corporation, with a principal place of business in the State of New Jersey, and has conducted business in the Commonwealth of Massachusetts.

2FF. The defendant, Ingersoll-Rand Company, is a New Jersey corporation having a principal place of business in New Jersey and is registered to and has conducted business in the Commonwealth of Massachusetts.

2GG. The defendant, ITT Corporation as Successor to Bell & Gossett, Hoffman Pumps, and Kennedy Valves, is a foreign corporation incorporated under the laws of the State of Indiana having a principal place of business in White Plains, New York, and has conducted business in the Commonwealth of Massachusetts.

2HH. The defendant, Marotta Controls, Inc., is a foreign corporation incorporated under the laws of the State of New Jersey, having a principal place of business outside the Commonwealth of Massachusetts, and has conducted business in the Commonwealth of Massachusetts.

2II. The defendant, Marshall Engineered Products Company, LLC, is a corporation incorporated under the laws of the State of Delaware, having a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2JJ. The defendant, Milwaukee Valve Company, Inc., is a corporation incorporated under the laws of the State of Wisconsin and has a principal place of business in the State of Wisconsin and has conducted business in the Commonwealth of Massachusetts.

2KK.  The defendant, Neles-Jamesbury, Inc. f/k/a Jamesbury Corporation, is a corporation incorporated under the laws of the Commonwealth of Massachusetts, having a principal place of business in the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2LL.  The defendant, Parker-Hannifin Corporation, is a corporation incorporated under the laws of the State of Ohio having a principal place of business in the State of Ohio and has conducted business in the Commonwealth of Massachusetts.

2MM. The defendant, Quaker Chemical Corporation, is a foreign corporation with a principal place of business outside the Commonwealth of Massachusetts which has done business in Massachusetts.

2NN.  The defendant, Roper Industries, Inc., is a corporation incorporated under the laws of the State of Delaware with a principal place of business in the State of Georgia and has conducted business in the Commonwealth of Massachusetts.

2OO.  The defendant, Roth Pump Company, is a corporation incorporated under the laws of the State of Delaware with a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2PP.  The defendant, Sepco Corporation, is a foreign corporation, having a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2QQ.  The defendant, Sterling Fluid Systems (USA), Inc., Individually and as Successor to Peerless Pump Co., is a foreign corporation incorporated under the laws of the State of Delaware, having a principal place of business in the State of Indiana, and has conducted business in the Commonwealth of Massachusetts.

8

2RR.    The defendant, Taco, Inc., is a foreign corporation with a principal place of business outside the Commonwealth of Massachusetts which has done business in Massachusetts.

2SS.    The defendant, The Fairbanks Company, is a corporation incorporated under the laws of the State of Georgia, having a principal place of business in the State of Georgia, and has conducted business in the Commonwealth of Massachusetts.

2TT.    The defendant, The Gorman-Rupp Company, is a corporation incorporated under the laws of the State of Ohio with a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2UU.    The defendant, Tyco Valves & Controls, Inc. as Successor to Crosby Valves, is a foreign corporation incorporated under the laws of the State of Texas, having a principal place of business in the State of Florida and has conducted business in the Commonwealth of Massachusetts.

2VV.    The defendant, Velan Valve Corporation, is a foreign corporation incorporated under the laws of the State of New York, having a principal place of business outside the Commonwealth of Massachusetts, and has conducted business in the Commonwealth of Massachusetts.

2WW.   The defendant, Viad Corp. as Successor to Griscom Russell, is a domestic corporation with a principal place of business outside the Commonwealth of Massachusetts which has done business in Massachusetts.

2XX.    The defendant, Viking Pump, Inc., is a corporation incorporated under the laws of the State of Delaware, having a principal place of business in the State of New York and has conducted business in the Commonwealth of Massachusetts.

2YY.    The defendant, Warren Pumps LLC, is a corporation incorporated under the laws of the Commonwealth of Massachusetts having a principal place of business located in Warren, Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2ZZ.    The defendant, Yarway Corporation, is a foreign corporation with a principal place of business outside the Commonwealth of Massachusetts which has done business in Massachusetts.

2AAA.  The defendant, Yeomans Chicago Corporation, is a corporation incorporated under the laws of the State of Illinois having a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2BBB.  The defendant, York International Corporation, is a foreign corporation having a principal place of business outside the Commonwealth of Massachusetts and has conducted business in the Commonwealth of Massachusetts.

2CCC.  The defendant, Selby, Battersby & Company, is a corporation incorporated under the laws of the State of Delaware having a principal place of business located in the State of Pennsylvania, and has conducted business in the Commonwealth of Massachusetts.

2DDD.  The defendant, Graver Technologies LLC, is a foreign corporation incorporated under the laws of the State of Delaware, having a principal place of business in the State of Illinois, and has conducted business in the Commonwealth of Massachusetts.

2EEE.  The defendant, Marmon Wire & Cable LLC f/k/a The Marmon Corporation, Successor to Ecodyne Water Treatment LLC, is a foreign corporation incorporated under the laws of the State of Delaware with a principal place of business in the State of Illinois and has conducted business in the Commonwealth of Massachusetts.

2FFF.  The defendant, Marmon Wire & Cable LLC f/k/a The Marmon Corporation, Successor to Graver Technologies, is a foreign corporation incorporated under the laws of the State of Delaware with a principal place of business in the State of Illinois and has conducted business in the Commonwealth of Massachusetts.

As used in this Complaint, the terms "defendant", "defendants" or "defendant corporations" shall include the party defendants identified in paragraphs 2A-2FFF hereof, and their predecessors and

successors, which shall include, but is not limited to, any person, corporation, company or business entity: which formed part of any combination, consolidation, merger or reorganization from which any party defendant was created or was the surviving corporation or other entity, or into which any party defendant was merged, consolidated or reorganized; whose assets, stock, property, employees, customers, good will, products or product line was acquired by or from any party defendant; whose patent rights, trademark rights, trade secrets or goodwill was acquired by or from any party defendant; or, which was dominated or controlled by any party defendant to such an extent that said party defendant was the "alter ego" of said corporation.

3.     The plaintiff's cause of action arises from the defendants: (a) transacting business in Massachusetts; (b) contracting to supply and/or sell goods in Massachusetts; (c) doing or causing a tortious act to be done within Massachusetts; and/or, (d) causing the consequence of a tortious act to occur within Massachusetts.

4.     The plaintiff's decedent, John M. Murray, was exposed to defendants' asbestos and asbestos-containing materials while working as a rigger at the Boston Naval Shipyard, Charlestown, Massachusetts from approximately 1946 to 1973.

5.     During the period of time set forth in Paragraph 4, the plaintiff's decedent, John M. Murray, was exposed to and did inhale and/or ingest asbestos dust, fibers, and particles, which dust, fibers, and particles came from the asbestos or asbestos-containing products which were mined, milled, manufactured, fabricated, supplied, sold, and/or specified by the defendant corporations.

6.     The asbestos and asbestos-containing products to which the plaintiff's decedent, John M. Murray, was exposed to were mined, milled, manufactured, fabricated, supplied, sold, and/or specified by the defendant corporations, acting through their duly authorized agents, servants, and employees, who were then and there acting in the course and scope of their employment and in furtherance of the business of the defendants.

7.    At all times pertinent hereto, the defendant corporations were engaged in the business of mining, milling, manufacturing, fabricating, supplying, and/or selling asbestos and asbestos-containing products and/or equipment which included and/or specified asbestos and asbestos-containing products to be used thereon or therein.

8.    At all times pertinent hereto, the asbestos products were products mined, milled, manufactured, fabricated, supplied and/or sold by the defendant corporations and reached the plaintiff's decedent, John M. Murray, without any substantial change in the condition of the product or products from the time that they were sold.

## COUNT I - NEGLIGENCE FOR NON-NAVAL EXPOSURE

9.    The plaintiff realleges the allegations of Paragraphs 1 through 8 of the Complaint, and by reference, makes them part of this Count.

10.    The allegations within this Count I are limited to all of the plaintiff's decedent's exposures to asbestos not including exposure arising out of the construction and maintenance of ships intended for use as Naval vessels.

11.    It was the duty of the defendant corporations to use and exercise reasonable and due care in the manufacture, fabricating, testing, inspection, production, marketing, packaging and sale of their asbestos and asbestos-containing products or equipment.

12.    It was also the duty of the defendant corporations to provide detailed and adequate instructions relative to the proper and safe handling and use of their asbestos and asbestos products and equipment, and to provide detailed and adequate warnings concerning any and all dangers, characteristics, and potentialities of their asbestos and asbestos-containing products and equipment.

13.    It was the continuing duty of the defendant corporations to advise and warn purchasers, consumers, users, and prior purchasers, consumers, and users of all dangers, characteristics,

12

potentialities and defects discovered subsequent to their initial marketing or sale of their asbestos and asbestos-containing products and equipment.

14.    Yet, nevertheless, wholly disregarding the aforesaid duties, the defendant corporations breached their duties by: (a) failing to warn the plaintiff's decedent of the dangers, characteristics, and potentialities of their asbestos-containing product or products when the defendant corporations knew or should have known that exposure to their asbestos-containing products would cause disease and injury; (b) failing to warn the plaintiff's decedent of the dangers to which he was exposed when they knew or should have known of the dangers; (c) failing to exercise reasonable care to warn the plaintiff's decedent of what would be safe, sufficient, and proper protective clothing, equipment, and appliances when working with or near or being exposed to their asbestos and asbestos-containing products; (d) failing to provide safe, sufficient and proper protective clothing, equipment and appliances with their asbestos-containing product or products; (e) failing to test their asbestos and asbestos products in order to ascertain the extent of dangers involved upon exposure thereto; (f) failing to conduct such research as should have been conducted in the exercise of reasonable care, in order to ascertain the dangers involved upon exposure to their asbestos and asbestos-containing products; (g) failing to remove the product or products from the market when the defendant corporations knew or should have known of the hazards of exposure to their asbestos and asbestos-containing products; (h) failing upon discovery of the dangers, hazards, and potentialities of exposure to asbestos to adequately warn and apprise the plaintiff's decedent of the dangers, hazards, and potentialities discovered; (i) failing upon discovery of the dangers, hazards, and potentialities of exposure to asbestos to package said asbestos and asbestos-containing products so as to eliminate said dangers, hazards, and potentialities; (j) specifying the use of asbestos and asbestos-containing material in the installation, and expected routine maintenance of the defendants' equipment without providing adequate warning to those who would foreseeably come into contact with such asbestos and asbestos-containing material (k) failing to provide an adequate warning

13

to those who would foreseeably come into contact with asbestos and asbestos-containing material which was specified, recommended, required or necessarily used in the installation and/or continued maintenance of the defendants' equipment and, (1) generally using unreasonable, careless, and negligent conduct in the manufacture, fabricating, supply, or sale of their asbestos and asbestos-containing products.

15. As a direct and proximate result of the unreasonable, careless, and negligent conduct of the defendant corporations, the plaintiff's decedent, John M. Murray, contracted asbestosis and other asbestos-related disease. Prior to his death, John M. Murray endured great physical pain and suffering, and incurred substantial medical expenses in connection with the treatment of his asbestosis and other asbestos-related disease.

16. The defendants knew, or with the reasonable exercise of care, should have known of the dangerous characteristics, properties, and potentialities of asbestos and asbestos-containing products.

WHEREFORE, the plaintiff, Catherine Murray, as Executrix of the Estate of John M. Murray, demands compensatory damages, plus interest and costs.

## COUNT II - BREACH OF EXPRESSED AND IMPLIED WARRANTIES FOR NON-NAVAL EXPOSURE

17. The plaintiff realleges the allegations of Paragraphs 1 through 16 of the Complaint, and by reference, makes them part of this Count.

18. The allegations within this Count II are limited to all of the plaintiff's decedent's exposures to asbestos not including exposure arising out of the construction and maintenance of ships intended for use as Naval vessels.

19. The plaintiff's decedent was a person whom the defendants could reasonably have expected to use, consume, or be affected by the defendants' asbestos and asbestos-containing products and equipment within the meaning of Massachusetts General Laws ch. 106, §2-318, as the defendants

14

knew or had reason to know that their asbestos-containing products would be used in the insulation, construction and/or ship building industry and that individuals such as the plaintiff's decedent would come in contact with such asbestos materials.

20. The defendants expressly and impliedly warranted that the asbestos and asbestos-containing products and equipment described above were merchantable, safe, and fit for their ordinary and the particular purposes and requirements of the plaintiff's decedent.

21. The defendants had reason to know of the particular purposes for which their asbestos and asbestos-containing products and equipment would be used.

22. The plaintiff's decedent relied upon the defendants' skill or judgment in selecting suitable mechanical material, insulation or construction products for safe use.

23. The defendants breached these warranties, in that the asbestos-containing products and equipment they sold were not merchantable, safe, suitable, or fit for their ordinary or particular purposes.

24. As a direct and proximate result of the defendants' breach of warranties, the plaintiff's decedent, John M. Murray, contracted asbestosis and other asbestos-related disease. Prior to his death, John M. Murray endured great physical pain and suffering, and incurred substantial medical expenses in connection with the treatment of his asbestosis and other asbestos-related disease.

WHEREFORE, the plaintiff, Catherine Murray as Executrix of the Estate of John M. Murray, demands compensatory damages, plus interest and costs.

## COUNT III - NEGLIGENCE FOR NAVAL EXPOSURE

25. The plaintiff realleges the allegations of Paragraphs 1 through 24 of the Complaint, and by reference, makes them part of this Count.

26. The allegations within this Count III are limited to the plaintiff's decedent's exposures arising out of the construction and maintenance of naval vessels.

15

27.    It was the duty of the defendant corporations to provide detailed and adequate instructions relative to the proper and safe handling and use of their asbestos and asbestos products and equipment, and to provide detailed and adequate warnings concerning any and all dangers, characteristics, and potentialities of their asbestos and asbestos-containing products or equipment.

28.    It was the continuing duty of the defendant corporations to advise and warn purchasers, consumers, users, and prior purchasers, consumers, and users of all dangers, characteristics, potentialities and defects discovered subsequent to their initial marketing or sale of their asbestos and asbestos-containing products and equipment.

29.    Yet, nevertheless, wholly disregarding the aforesaid duties, the defendant corporations breached their duties by:  (a) failing to warn the plaintiff's decedent of the dangers, characteristics, and potentialities of their asbestos-containing product or products when the defendant corporations knew or should have known that exposure to their asbestos-containing products would cause disease and injury; (b) failing to warn the plaintiff's decedent of the dangers to which he was exposed when they knew or should have known of the dangers; (c) failing to exercise reasonable care to warn the plaintiff's decedent of what would be safe, sufficient, and proper protective clothing, equipment, and appliances when working with or near or being exposed to their asbestos and asbestos-containing products; (d) failing upon discovery of the dangers, hazards, and potentialities of exposure to asbestos to adequately warn and apprise the plaintiff's decedent of the dangers, hazards, and potentialities discovered; (e) failing to provide an adequate warning to those who would foreseeably come into contact with asbestos and asbestos-containing material which was specified, recommended, required or necessarily used in the installation and/or continued maintenance of the defendants' equipment.

30.    As a direct and proximate result of the unreasonable, careless, and negligent conduct of the defendant corporations, the plaintiff's decedent, John M. Murray, contracted asbestosis and other asbestos-related disease.  Prior to his death, John M. Murray endured great physical pain and suffering,

and incurred substantial medical expenses in connection with the treatment of his asbestosis and other asbestos-related disease.

31.    The defendants knew, or with the reasonable exercise of care, should have known of the dangerous characteristics, properties, and potentialities of asbestos and asbestos-containing products.

WHEREFORE, the plaintiff, Catherine Murray as Executrix of the Estate of John M. Murray, demands compensatory damages, plus interest and costs.

## COUNT IV - BREACH OF EXPRESSED AND IMPLIED WARRANTIES FOR NAVAL EXPOSURE

32.    The plaintiff realleges the allegations of Paragraphs 1 through 31 of the Complaint, and by reference, makes them part of this Count.

33.    The allegations within this Count IV are limited to the plaintiff's decedent's exposures arising out of the construction and maintenance of naval vessels.

34.    The plaintiff's decedent was a person whom the defendants could reasonably have expected to use, consume, or be affected by the defendants' asbestos and asbestos-containing products or equipment within the meaning of Massachusetts General Laws ch. 106, §2-318, as the defendants knew or had reason to know that their asbestos-containing products and equipment would be used in the insulation, construction and/or ship building industry and that individuals such as the plaintiffs decedent would come in contact with defendants' asbestos materials and asbestos materials which were specified or known to be used in and upon defendants' equipment.

35.    The defendants expressly and impliedly warranted that the asbestos and asbestos-containing products and equipment described above were merchantable, safe, and fit for their ordinary and the particular purposes and requirements of the plaintiff's decedent.

36.    The defendants breached the warranty of merchantability by failing to adequately warn the plaintiff's decedent of the dangers of their asbestos and/or asbestos-containing products and

17

equipment, of the hazards of inhalation of asbestos-containing dust and of the ability of asbestos to migrate through the air and upon the clothing and person of those working with or in the vicinity of such products.

37.     As a direct and proximate result of the defendants' breach of warranties, the plaintiff's decedent, John M. Murray, contracted asbestosis and other asbestos-related disease. Prior to his death, John M. Murray endured great physical pain and suffering, and incurred substantial medical expenses in connection with the treatment of his asbestosis and other asbestos-related disease.

WHEREFORE, the plaintiff, Catherine Murray as Executrix of the Estate of John M. Murray, demands compensatory damages, plus interest and costs.

## COUNT V - WRONGFUL DEATH: MALICIOUS, WILLFUL, WANTON AND RECKLESS CONDUCT OR GROSS NEGLIGENCE: MASS. GEN. L. CH. 229, §2

38.     The plaintiff realleges the allegations of Paragraphs 1 through 37 of the Complaint, and by reference, makes them part of this Count.

39.     As early as 1929, the defendants, or some of them, possessed medical and scientific data clearly indicating that asbestos and asbestos-containing products were hazardous to the health and safety of John M. Murray and others in his position.

40.     The defendants, or some of them, during the 1930's, 1940's, 1950's, and 1960's became possessed of voluminous medical and scientific data, studies, and reports, which information conclusively established that asbestos and asbestos-containing products were hazardous to the health and safety of John M. Murray and all other persons exposed to the products.

41.     The defendants, or some of them, since the 1930's have had numerous workmen's compensation claims filed against them by former asbestos workers or employees, or knew such claims were filed against asbestos product suppliers and manufacturers.

42.    Prompted by pecuniary motives, the defendants ignored and failed to act upon such medical and scientific data and conspired to deprive the public, and particularly the users, from access to said medical and scientific data, thereby depriving them of the opportunity of free choice as to whether or not to expose themselves to the asbestos products of the defendants.

43.    The defendants acted maliciously, willfully, wantonly, and recklessly, or with gross negligence, by continuing to market their asbestos products, with reckless disregard for the health and safety of the plaintiff's decedent, John M. Murray, and other users or consumers, knowing the dangerous characteristics and propensities of said asbestos products, but still depriving those affected by the dangers from information about those dangers.

44.    Because the defendants acted maliciously, willfully, wantonly, and recklessly, or with gross negligence, in marketing their hazardous asbestos and asbestos-containing products, in ignoring the medical and scientific data which was available to them, and depriving consumers, users, and the general public from that medical and scientific data, the plaintiff, Catherine Murray, as Executrix of the Estate of John M. Murray is entitled to punitive damages.

45.    As a result of working with, around or near others who worked with, around or near asbestos materials supplied by defendants to the plaintiff's decedent, John M. Murray's employers, the plaintiff's decedent, John M. Murray, contracted asbestosis and other asbestos-related disease, which substantially contributed to his death on March 6, 2010.

46.    The plaintiff's decedent, John M. Murray, is survived by his family, who by reason of said death has been deprived of income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the said plaintiff's decedent, John M. Murray. In addition, the estate of the plaintiff's decedent, John M. Murray, has incurred reasonable funeral and burial expenses as a result of the death of the plaintiff's decedent, John M. Murray.

19.

WHEREFORE, the plaintiff, Catherine Murray, as Executrix of the Estate of John M. Murray, demands compensatory and punitive damages pursuant to Mass. Gen. L. c. 229, §2, in addition to the damages demanded in Counts I through IV, plus interest and costs.

The plaintiff demands a trial by jury on all issues.

DATED:  October 19, 2012                    Respectfully submitted,


_Zoran Malesevic_

Zoran Malesevic, Esq.
(BBO# 659686)
THORNTON & NAUMES, LLP
100 Summer Street, 30th Floor
Boston, MA 02110
(617) 720-1333   FAX (617)720-2445
zmalesevic@tenlaw.com

# EXHIBIT "G"

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  | : |  |
|---|---|---|
| AMERICAN PRECISION INDUSTRIES, INC., | : | |
| | : | **Dkt. No. 1:14-cv-01050-RJA-HKS** |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, and NORTH RIVER INSURANCE COMPANY, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## STIPULATION REGARDING DEFENSE FEES AND COSTS
## INCURRED PRIOR TO OCTOBER 23, 2017

This Stipulation is entered into by and between Plaintiff American Precision Industries, Inc. ("API"), on the one hand, and Defendants Federal Insurance Company ("Federal"), Fireman's Fund Insurance Company ("Fireman's Fund"), and North River Insurance Company ("North River"), on the other. Federal, Fireman's Fund, and North River may hereinafter be referred to collectively as the "Defendants," while API and the Defendants may hereinafter be referred to collectively as the "Parties."

WHEREAS, API filed the above captioned lawsuit against the Defendants in the United States District Court for the Western District of New York on or about December 16, 2014 seeking coverage for asbestos lawsuits under primary liability insurance policies issued to API by the Defendants;

WHEREAS, API seeks, among other things, recovery from the Defendants of past and future amounts API alleges it incurred in defense of the asbestos lawsuits;

WHEREAS, the Defendants have disputed API's allegations that they are obligated to pay the defense fees and costs API alleges it incurred in defense of the asbestos lawsuits prior to October 23, 2017;

WHEREAS, the Defendants' expert reviewed the claim bordereau dated August 2, 2018 API produced in this action setting forth the amounts it seeks to recover from the Defendants for defense fees and costs it alleges it incurred in defense of the asbestos lawsuits prior to October 23, 2017 and the documents API produced in support of its claim, and submitted a report setting forth her conclusions;

WHEREAS, API disputes the Defendants' expert's conclusions in her report regarding the amount of defense fees and costs which API contends are substantiated through invoices and documentation in support of its claim;

WHEREAS, the Parties have engaged in discussions regarding the Defendants' expert's conclusions and certain additional documents and information API provided in response to Defendants' expert report regarding the amount API seeks to recover for defense fees and costs it alleges it incurred in defense of the asbestos lawsuits prior to October 23, 2017;

WHEREAS, the Parties desire to enter this stipulation to memorialize their agreement regarding the amount of fees and costs API alleges in this lawsuit it incurred for the defense of the asbestos lawsuits prior to October 23, 2017, and to eliminate any need for API to submit an expert report, or for the Parties to engage in expert discovery.

NOW, THEREFORE, in consideration of the mutual promises contained here, the Parties hereby stipulate as follows:

1.     The Defendant insurers agree that API has provided invoices or other documentary support to confirm legal expenses and costs related to the matters listed in API's August 2018 claim bordereau of $4,774,757 (the "Stipulated Past Defense Costs Claim").

2.     The Defendants reserve their rights regarding whether the Stipulated Past Defense Costs Claim is covered under their policies.

3.     The Parties reserve all other claims, causes of action, arguments, and defenses in this litigation, including, but not limited to, with respect to the reasonableness of the amount of the costs stipulated herein, the amount of fees and costs allegedly incurred by API in defense of the asbestos lawsuits after October 23, 2017, as well as for pre-judgment and post-judgment interest.

4.     The Parties agree that New York law applies to the interpretation and application of the insurance policies issued by Defendants to API.

| **AMERICAN PRECISION INDUSTRIES, INC.** | **FEDERAL INSURANCE COMPANY** |
|---|---|
| By: _____ <br>     Gita Rothschild <br>     Adam Budesheim <br>     David C. Kane <br>     McCarter & English, LLP <br>     100 Mulberry Street <br>     Four Gateway Center <br>     Newark, NJ 07102 <br><br> DATED: July 7, 2020 | By: *Frank Slepicka* <br>     Frank B. Slepicka <br>     Cohn Baughman & Serlin <br>     333 West Wacker <br>     Suite 900 <br>     Chicago, IL 60606 <br><br><br> DATED: July 7, 2020 |

| **FIREMAN'S FUND INSURANCE COMPANY** | **NORTH RIVER INSURANCE COMPANY** |
|---|---|
| By: _____ | By: _____ |
| Peter P. McNamara | Matthew Thomas Walsh |
| Lawrence A. Levy | Kennedys CMK LLP |
| Rivkin, Radler LLP | 100 North Riverside Plaza |
| 926 RXR Plaza | Suite 2100 |
| Uniondale, NY 11556 | Chicago, IL 60606 |
| | |
| DATED: July 7 , 2020 | DATED: July 7 , 2020 |

4763229 v2

EXHIBIT "H"

| | |
|---|---|
| AMERICAN PRECISION INDUSTRIES, INC., | : **Dkt. No. 1:14-cv-01050-RJA-HKS** |
| | : |
| Plaintiff, | : |
| | : **PLAINTIFF AMERICAN PRECISION** |
| vs. | : **INDUSTRIES, INC.'S RESPONSES AND** |
| | : **OBJECTIONS TO DEFENDANT** |
| FEDERAL INSURANCE COMPANY, | : **FEDERAL INSURANCE COMPANY'S** |
| FIREMAN'S FUND INSURANCE | : **SECOND SET OF INTERROGATORIES** |
| COMPANY, and NORTH RIVER | : |
| INSURANCE COMPANY, | : |
| | : |
| Defendants. | : |
| | : |

**COUNSEL**:

PLEASE TAKE NOTICE that the undersigned, attorneys for Plaintiff American Precision Industries, Inc. ("API"), hereby submit responses and objections to Defendant Federal Insurance Company's ("Federal") Second Set of Interrogatories (the "Interrogatories").

Neither the responses herein nor any documents which may be produced or referenced in response to these Interrogatories are intended to waive the protections of the attorney-client privilege, the work product doctrine, the self-critical analysis privilege, the joint defense or common interest privilege, or any other applicable privilege or immunity. API answers these Interrogatories based on information reasonably available to it, its agents, employees and attorneys, in accordance with the Federal Rules of Civil Procedure ("F.R.C.P."), the Local Rules of the United States District Court for the Western District of New York ("Local Rules"), and in the manner set forth in the attached Certification. API does not waive any evidentiary or other objections to the information or materials contained or referenced herein. Nothing in these responses or documents referenced herein shall be argued to be, or construed as, an admission by

API of its relevancy or admissibility at trial, and API reserves all of its rights to raise such objections.

API expressly reserves the right to amend or to supplement its responses and objections to these Interrogatories as additional responsive information becomes available by way of discovery or otherwise. API's responses to these Interrogatories are accurate as of the date made. API is engaged in continuing investigation of the matters inquired into by these Interrogatories, and API cannot exclude the possibility that it may obtain more complete information or information which indicates that a response is incorrect and/or incomplete. API will provide supplemental information, if any, as required by the F.R.C.P. and Local Rules.

**McCARTER & ENGLISH, LLP**

By: _____
    Gita F. Rothschild
    Adam J. Budesheim
    David C. Kane
    Attorneys for Plaintiff
    American Precision Industries, Inc.

Dated: June 4, 2018

# GENERAL OBJECTIONS

These general objections and responses form a part of API's response to each and every Interrogatory. Thus, the absence of a reference to a general objection in any response cannot be construed as a waiver of the general objections in response to a specific Interrogatory.

1.    API objects to these Interrogatories to the extent the information sought is protected by the attorney work-product doctrine, the attorney-client privilege, the joint defense or common interest privilege, or other applicable privileges or immunities.

2.    API objects to the extent the Interrogatories seek information not reasonably available to it, its agents, employees, and attorneys in accordance with the F.R.C.P. and Local Rules.

3.    API objects to these Interrogatories to the extent they seek information that is known by or in the care, custody or control of persons other than API.

4.    API objects to these Interrogatories to the extent they include contention interrogatories, which may be premature at this point in litigation. API reserves the right to modify, supplement or change these responses as discovery continues.

5.    API objects to these Interrogatories to the extent they seek confidential information relating to API's operations. The prejudice to API that would result from unrestricted disclosure far outweighs the relevance of the information to this action.

6.    API objects to the "Instructions" and "Definitions" in the Interrogatories to the extent they are vague, excessive, ambiguous, vexatious, overly broad, not stated with reasonable particularity, and exceed what is permitted by the F.R.C.P and Local Rules.

7.    API objects to these Interrogatories to the extent they are overbroad, overly burdensome, vexatious, harassing, ambiguous, and not stated with particularity.

8.    API objects to these Interrogatories to the extent that they seek information concerning or contained in documents that no longer exist.

9.    API objects to these Interrogatories to the extent they are unlimited in time or otherwise not limited to a time frame relevant to this litigation, on the grounds that such requests seek information neither relevant to the subject matter of the litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

10.    API objects to these Interrogatories to the extent they seek discovery that is unreasonably duplicative or cumulative, or is already in the possession of Federal, or is obtainable from some other source that is more convenient, less burdensome or less expensive.

11.    API objects to these Interrogatories to the extent they use undefined terms and phrases, are ambiguous and are unlimited in scope.

12.    API objects to these Interrogatories to the extent they seek information and/or documents neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

13.    API objects to the Interrogatories to the extent they seek information that already should have been in the possession of Federal pursuant to its duty to conduct an intelligent, thorough, good faith claims investigation.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

1.    In connection with Your acquisition and/or formation of API AirTech Inc., did You or any company or person affiliated with You undertake any investigation, research, inquiries or other affirmative action(s) to ascertain whether Similar Insurance providing coverage for API AirTech Inc. for the whole or any portion of the policy period April 1, 1996 to April 1, 1997 was available for purchase or otherwise available? If Your response is in the affirmative, please describe and identify:

       a. Any and all actions that were undertaken and results of same; and

       b. All persons with knowledge of those actions and results.

**RESPONSE: In addition to its General Objections, which are incorporated by reference as if set forth in full herein, API specifically objects to this Interrogatory on the grounds that: (1) it is overbroad because API AirTech Inc. did not exist until September 20, 1996; (2) the definition of "Similar Insurance" and the phrase "was available for purchase or otherwise available" are vague and ambiguous; and (3) the phrase "was available for purchase or otherwise available" is overbroad and seeks irrelevant information because the "Subsidiaries or Newly Acquired or Formed Organizations" provision in Federal's primary liability policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 refers to "other similar insurance available" to API AirTech Inc., rather than "other similar insurance available" generally for purchase in the marketplace.**

**Subject to and without waiving its objections, API states that "there is no other similar insurance available" to API AirTech Inc. for the period from September 20, 1996 through April 1, 1997. API further states that no attempt was made prior to April 1, 1997 to purchase "other similar insurance" for API AirTech Inc. because API AirTech Inc.**

became a "named insured" under Federal's primary liability policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 "effective on the ... formation date" pursuant to the "Subsidiaries or Newly Acquired or Formed Organizations" provision.

2.    In connection with Your acquisition and/or formation of API Basco Inc., did You or any company or person affiliated with You undertake any investigation, research, inquiries or other affirmative action(s) to ascertain whether Similar Insurance providing coverage for API Basco Inc. for the whole or any portion of the policy period April 1, 1996 to April 1, 1997 was available for purchase or otherwise available? If Your response is in the affirmative, please describe and identify:

        a. Any and all actions that were undertaken and results of same; and

        b. All persons with knowledge of those actions and results.

**RESPONSE: In addition to its General Objections, which are incorporated by reference as if set forth in full herein, API specifically objects to this Interrogatory on the grounds that: (1) it is overbroad because API Basco Inc. did not exist until September 20, 1996; (2) the definition of "Similar Insurance" and the phrase "was available for purchase or otherwise available" are vague and ambiguous; and (3) the phrase "was available for purchase or otherwise available" is overbroad and seeks irrelevant information because the "Subsidiaries or Newly Acquired or Formed Organizations" provision in Federal's primary liability policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 refers to "other similar insurance available" to API Basco Inc., rather than "other similar insurance available" generally for purchase in the marketplace.**

**Subject to and without waiving its objections, API states that "there is no other similar insurance available" to API Basco Inc. for the period from September 20, 1996**

through April 1, 1997. **API further states that no attempt was made prior to April 1, 1997 to purchase "other similar insurance" for API Basco Inc. because API Basco Inc. became a "named insured" under Federal's primary liability policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 "effective on the ... formation date" pursuant to the "Subsidiaries or Newly Acquired or Formed Organizations" provision.**

3.    In connection with Your acquisition and/or formation of API Heat Transfer Inc., did You or any company or person affiliated with You undertake any investigation, research, inquiries or other affirmative action(s) to ascertain whether Similar Insurance providing coverage for API Heat Transfer Inc. for the whole or any portion of the policy period April 1, 1996 to April 1, 1997 was available for purchase or otherwise available? If Your response is in the affirmative, please describe and identify:

      a. Any and all actions that were undertaken and results of same; and

      b. All persons with knowledge of those actions and results.

**RESPONSE: In addition to its General Objections, which are incorporated by reference as if set forth in full herein, API specifically objects to this Interrogatory on the grounds that: (1) it is overbroad because API Heat Transfer Inc. did not exist until September 20, 1996; (2) the definition of "Similar Insurance" and the phrase "was available for purchase or otherwise available" are vague and ambiguous; and (3) the phrase "was available for purchase or otherwise available" is overbroad and seeks irrelevant information because the "Subsidiaries or Newly Acquired or Formed Organizations" provision in Federal's primary liability policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 refers to "other similar insurance available" to API**

Heat Transfer Inc., rather than "other similar insurance available" generally for purchase in the marketplace.

Subject to and without waiving its objections, API states that "there is no other similar insurance available" to API Heat Transfer Inc. for the period from September 20, 1996 through April 1, 1997. API further states that no attempt was made prior to April 1, 1997 to purchase "other similar insurance" for API Heat Transfer Inc. because API Heat Transfer Inc. became a "named insured" under Federal's primary liability policy number 3530-67-00 covering April 1, 1996 through April 1, 1997 "effective on the ... formation date" pursuant to the "Subsidiaries or Newly Acquired or Formed Organizations" provision.